## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | |
|---|---|
| BNSF RAILWAY COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PIERSON BEAULIEU, individually, | ) |
| | ) |
| DUSTIN BOYD, individually, | ) |
| | ) |
| WENDY BURKETT, individually, | ) |
| | ) CASE NO.: |
| JOSEPH DISCIACCA, individually, | ) |
| | ) |
| TODD COVINGTON, individually, | ) |
| | ) |
| NICOLAS DEHOYOS, individually, | ) |
| | ) |
| SUSAN JUAREZ-MORA, individually, and | ) |
| As Next Friend of A.J.M., a minor; | ) |
| | ) |
| A.J.M, a minor, by and | ) |
| Through her Next Friend, Susan Juarez-Mora; | ) |
| | ) |
| JONATHAN AWE, individually, and | ) |
| As Next Friend of I.A., a minor; | ) |
| | ) |
| I.A., a minor, by and | ) |
| Through his Next Friend, Jonathan Awe; | ) |
| | ) |
| ELIJAH AWE, individually; | ) |
| | ) |
| JULIAN BOARDMAN, individually; and | ) |
| | ) |
| HARRISON BOARDMAN, individually, | ) |
| | ) |
| Defendants. | ) |

{00235831.DOCX}

## COMPLAINT TO COMPEL ARBITRATION

For its Complaint to Compel Arbitration against Defendants, Plaintiff BNSF Railway Company ("BNSF") states as follows:

## NATURE OF THE ACTION

1. This is an action for relief under the Federal Arbitration Act, 9 U.S.C. § 4, arising out of Defendants' refusal to comply with the terms of a pre-dispute arbitration agreement binding upon the parties in connection with Defendants' state-court claims against BNSF. BNSF seeks an Order from this Court compelling arbitration of Defendants' claims, staying the pending Missouri state court actions Defendants have filed against BNSF and enjoining Defendants from pursuing the state court actions against BNSF while the parties arbitrate their claims.

## THE PARTIES

2. BNSF Railway Company is a Delaware corporation with its principal place of business in the state of Texas.

3. Pierson Beaulieu is domiciled in Missouri and holds a driver's license in Missouri. Therefore, she is a citizen of Missouri.

4. Dustin Boyd is domiciled in Missouri, owns personal and real property in Missouri, pays taxes in Missouri, and holds a driver's license in Missouri. Therefore, he is a citizen of Missouri.

5. Wendy Burkett is domiciled in Florida, owns personal and real property in Florida, pays taxes in Florida, and holds a driver's license in Florida. Therefore, she is a citizen of Florida.

6. Joseph Disciacca is domiciled in Missouri, owns personal and real property in Missouri, pays taxes in Missouri, and holds a driver's license in Missouri. Therefore, he is a citizen of Missouri.

7. Todd Covington is domiciled in Missouri, owns personal and real property in Missouri, pays taxes in Missouri, and holds a driver's license in Missouri. Therefore, he is a citizen of Missouri.

8. Nicolas Dehoyos is domiciled in Indiana, owns personal and real property in Indiana, and pays taxes in Indiana. Therefore, he is a citizen of Indiana.

9. Susan Juarez-Mora is domiciled in Indiana, owns personal and real property in Indiana, and pays taxes in Indiana. Therefore, she is a citizen of Indiana.

10. Minor A.J.M. is domiciled with her mother, Susan Juarez-Mora, in Indiana. Therefore, minor A.J.M. is a citizen of Indiana.

11. Jonathan Awe is domiciled in Wisconsin, owns personal and real property in Wisconsin, pays taxes in Wisconsin, and holds a driver's license in Wisconsin. Therefore, he is a citizen of Wisconsin.

12. Minor I.A. is domiciled with his father, Jonathan Awe, in Wisconsin, and holds a driver's license in Wisconsin. Therefore, minor I.A. is a citizen of Wisconsin.

13. Elijah Awe[1] is domiciled in Wisconsin and holds a driver's license in Wisconsin. Therefore, he is a citizen of Wisconsin.

14. Julian Boardman is domiciled in Wisconsin, owns personal and real property in Wisconsin, pays taxes in Wisconsin, and holds a driver's license in Wisconsin. Therefore, he is a citizen of Wisconsin.

15. Harrison Boardman is domiciled in Wisconsin and holds a driver's license in Wisconsin. Therefore, he is a citizen of Wisconsin.

---

[1] In his underlying state court Petition, Elijah Awe is identified as a minor. However, as of the time of this Complaint's filing, Elijah Awe has reached the age of majority.

{00235831.DOCX}

3

## **AMOUNT(S) IN CONTROVERSY**

22. In her underlying state court action, Pierson Beaulieu claims she "sustained injuries that have caused her to experience and continue to experience physical pain and emotional distress, medical expenses, economic damages and noneconomic damages, she has incurred medical expenses and is reasonably certain to incur medical expenses in the future, and she has and will lose wages and benefits."[2] Based on Ms. Beaulieu's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

23. In his underlying state court action, Dustin Boyd claims he "sustained injuries that have caused [him] to experience and continue to experience physical pain and emotional distress, medical expenses, economic damages and noneconomic damages, [he] has incurred medical expenses and is reasonably certain to incur medical expenses in the future, and [he] has and will lose wages and benefits, all to [his] damage."[3] Based on Mr. Boyd's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

24. In her underlying state court action, Wendy Burkett claims she was "thrown violently about Train 4 during the collision and subsequent derailment and [has] sustained personal injuries, pain and suffering, emotional distress, and damages."[4] Based on Ms. Burkett's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

25. In his underlying state court action, Joseph Disciacca claims he was "thrown violently about Train 4 during the collision and subsequent derailment and [has] sustained personal

---

[2] Exhibit 1, First Amended Petition in Chariton County Case No. 24CH-CC00013, at ¶ 29.
[3] Exhibit 2, First Amended Petition in Chariton County Case No. 24CH-CC00016, at ¶ 36.
[4] Exhibit 3, First Amended Petition in Chariton County Case No. 23CH-CC00029, at ¶ 47.

{00235831.DOCX}

injuries, pain and suffering, emotional distress, and damages."[5] Based on Mr. Disciacca's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

26. In his underlying state court action, Todd Covington claims he was "thrown violently about Train 4 during the collision and subsequent derailment and [has] sustained personal injuries, pain and suffering, emotional distress, and damages."[6] Based on Mr. Covington's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

27. In his underlying state court action, Nicolas Dehoyos claims he "sustained injuries that have caused [him] to experience and continue to experience physical pain and emotional distress, medical expenses, economic damages and noneconomic damages, [he] has incurred medical expenses and is reasonably certain to incur medical expenses in the future, and [he] has and will lose wages and benefits, all to [his] damage."[7] Based on Mr. Dehoyos' allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

28. In her underlying state court action, Susan Juarez-Mora claims she "sustained injuries that have caused her to experience and continue to experience physical pain and emotional distress, medical expenses, economic damages and noneconomic damages, she has incurred medical expenses and is reasonably certain to incur medical expenses in the future, and she has and will lose wages and benefits."[8] Based on Ms. Juarez-Mora's allegations, it cannot be said with

---

[5] Id.
[6] Id.
[7] Exhibit 4, First Amended Petition in Chariton County Case No. 24CH-CC00014, at ¶ 36.
[8] Exhibit 5, First Amended Petition in Chariton County Case No. 24CH-CC00015, at ¶ 37.
{00235831.DOCX}

legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

29. In her underlying state court action, minor A.J.M. claims she "sustained injuries that have caused her to experience and continue to experience physical pain and emotional distress, medical expenses, economic damages and noneconomic damages, she has incurred medical expenses and is reasonably certain to incur medical expenses in the future, and she has and will lose wages and benefits."[9] Based on A.J.M.'s allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in her underlying state court action.

30. In his underlying state court action, Jonathan Awe claims he "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[10] Mr. Awe further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Mr. Awe's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

31. In his underlying state court action, minor I.A. claims he "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[11] I.A. further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the

---

[9] *Id.*
[10] Exhibit 6, First Amended Petition in Chariton County Case No. 22CH-CC00033, at ¶ 108.
[11] *Id.*

{00235831.DOCX}

6

future." Based on I.A.'s allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

33. In his underlying state court action, Elijah Awe claims he "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[12] Mr. Awe further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Mr. Awe's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

33. In his underlying state court action, Julian Boardman claims he "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[13] Mr. Boardman further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to cause damages in the future." Based on Mr. Boardman's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

34. In his underlying state court action, Harrison Boardman claims he "suffered serious, severe, and permanent physical and mental injuries, including past and future pain and suffering, past lost earnings and future loss of earnings and earning capacity, past and future medical and hospital expenses, loss of enjoyment of life, and emotional distress."[14] Mr. Boardman further claims "[t]hese injuries and damages are permanent and progressive in nature and will continue to

---

[12] *Id.*
[13] *Id.*
[14] *Id.*

{00235831.DOCX}

cause damages in the future." Based on Mr. Boardman's allegations, it cannot be said with legal certainty that the amount in controversy is less than $75,000 in his underlying state court action.

## JURISDICTION AND VENUE

35. This Court has original jurisdiction arising under 28 U.S.C. § 1332 because none of the Defendants are citizens of Delaware or Texas so there is complete diversity of citizenship between BNSF and Defendants, and the amount in controversy—for each respective Defendant in his or her underlying state court claim—exceeds $75,000.

36. Jurisdiction of this Court is further invoked under 9 U.S.C. § 4.

37. This Court has personal jurisdiction over the Missouri resident Defendants by virtue of their residency and personal jurisdiction over the Florida, Indiana, and Wisconsin resident Defendants because they consented as plaintiffs in their underlying state court actions.

38. Venue is proper under 28 U.S.C. § 1391, in that a substantial part of the events giving rise to Defendants' underlying state court actions occurred in this district.

## FACTUAL ALLEGATIONS

39. Defendants' state court claims arise out of an incident that occurred on June 27, 2022, while Pierson Beaulieu, Dustin Boyd, Wendy Burkett, Joseph Disciacca, Todd Covington, Nicolas Dehoyos, Susan Juarez-Mora, A.J.M., Jonathan Awe, I.A., Elijah Awe, Julian Boardman, and Harrison Boardman were traveling as passengers on National Railroad Passenger Corporation ("Amtrak") Train 4, also known as the Southwest Chief.

40. Train 4 was traveling from Los Angeles to Chicago when it struck a dump truck negligently and recklessly operated by an employee of M.S. Contracting, LLC at U.S. Department of Transportation Crossing No. 005284Y near Mendon, Missouri. The collision with the dump truck caused Train 4 to derail, allegedly resulting in personal injuries to Defendants.

41.     To purchase a ticket from Amtrak, whether on the website, mobile website, or app, customers must first affirmatively accept Amtrak's Terms and Conditions, which include a mutual agreement to arbitrate any claims between the customer and Amtrak ("Arbitration Agreement").

42.     When making an online ticket purchase through Amtrak's website, before they can complete their purchase, passengers must click a box acknowledging that they "have read and agree[d] to the terms and conditions, including the binding arbitration agreement…" An exemplar is below:

> ☑ I have read and agree to the terms and conditions, including the binding arbitration agreement and rules regarding COVID travel. The privacy policy applies.

43.     This provision also contains a link directly to the Terms and Conditions which may be found at https://www.amtrak.com/terms-and-conditions.html

44.     Defendants Jonathan Awe, I.A., Elijah Awe, Julian Boardman, and Harrison Boardman were part of a group that utilized Amtrak "group booking" to purchase tickets via telephone through the group's representative, Craig Thomas.

45.     Upon the group booking, Amtrak sent a letter to Mr. Thomas that stated, "Transportation on Amtrak is subject to the terms and conditions on your ticket and associated ticket jacket. Additional terms and travel information can be found on Amtrak.com."

46.     Amtrak then mailed each of the respective group members—including Jonathan Awe, I.A., Elijah Awe, Julian Boardman, and Harrison Boardman—paper tickets and ticket jackets that stated, "This ticket is a contract of carriage between Amtrak and the ticket holder which is subject to specific terms and conditions. Those terms and conditions are available for inspection at Amtrak ticket counters or on the Amtrak Web site at www.amtrak.com, or may be requested by calling 1-800-USA-RAIL."

47. Defendants respectively agreed to Version 2.9.15 or Version 2.9.16 of Amtrak's Terms and Conditions.

48. A true and correct copy of Version 2.9.15 of the Terms and Conditions is attached as <u>Exhibit 7</u>.

49. A true and correct copy of Version 2.9.16 of the Terms and Conditions is attached as <u>Exhibit 8</u>.

50. In all respects material to this Complaint, Version 2.9.15 and Version 2.9.16 are identical.

51. At the very top of those Terms and Conditions is a notice that states:

These terms and conditions contain a binding Arbitration Agreement below. Please read the Arbitration Agreement carefully because it applies mutually to You and Amtrak and requires that you resolve claims and disputes with Amtrak on an individual basis through arbitration and not by way of court or jury trial. By purchasing a ticket for travel on Amtrak, You are agreeing to these terms and conditions and agreeing to the Arbitration Agreement.

E.g., Ex. 7, p. 1.

52. The Arbitration Agreement states:

"Mutual Agreement to Arbitrate ("Arbitration Agreement"). This Arbitration Agreement is intended to be as broad as legally permissible, and, except as it otherwise provides, applies to **all claims**, disputes, or controversies, past, present, or future, that otherwise would be resolved in a court of law or before a forum other than arbitration. Amtrak and Customer (**on behalf of yourself and any individuals for whom you purchase tickets, including, without limitation, family members, minor passengers, colleagues and companions** (collectively "You" or "Your"), **AGREE that this Arbitration Agreement applies, without limitation, to claims Amtrak may have against You and claims You may have against Amtrak and any affiliates or related entities, or against any party to which Amtrak owes indemnity (which party may also enforce this Agreement), including without limitation any host railroad, based upon or related to:** these Terms and Conditions, breach of contract, **tort claims, common law claims,** Your relationship with Amtrak, tickets, services and accommodations provided by Amtrak, carriage on Amtrak trains and equipment, **any personal injuries (including, but not limited to, claims for negligence, gross negligence, physical impairment, disfigurement, pain and suffering, mental anguish, wrongful death, survival actions, loss of consortium and/or services, medical and hospital expenses, expenses of transportation for medical treatment, expenses of drugs and medical appliances, emotional distress, exemplary

**or punitive damages arising out of or related to any personal injury),** and any claims for discrimination and failure to accommodate, which shall be decided by a single arbitrator through binding arbitration and not by a judge or jury."

E.g., Ex. 7, pp. 58-61. (emphasis added)

53. The Arbitration Agreement also correctly notes that it "is governed by the Federal Arbitration Act ('FAA') and evidences a transaction involving commerce." *See* 9 U.S.C. § 1 ("'Commerce,' as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation…"); *see also* 9 U.S.C. § 2 ("A written provision in…a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract…shall be valid, irrevocable, and enforceable…"). *Id.*

54. The Arbitration Agreement permits "any party to which Amtrak owes indemnity…including without limitation any host railroad" to enforce its terms. The Arbitration Agreement states: "[T]his Arbitration Agreement applies, without limitation, to claims Amtrak may have against You and claims You may have against Amtrak and any affiliates or related entities, or **against any party to which Amtrak owes indemnity (which party may also enforce this Agreement), including without limitation any host railroad** . . ." *Id.* (emphasis added)

55. BNSF is a host railroad to which Amtrak owes indemnity, and, therefore, BNSF is expressly entitled to enforce the Arbitration Agreement.

56. Customers cannot complete their online or in-app ticket purchase until the box signaling agreement to the Terms and Conditions including the binding arbitration agreement is checked.

57. Passengers cannot board and travel upon Amtrak trains without presenting a ticket to a conductor, signaling the passenger's assent to the Terms and Conditions of the ticket.

58. On June 9, 2022, Pierson Beaulieu utilized the Amtrak app to purchase a ticket for herself to travel on Amtrak Train 4 from Kansas City to Chicago, departing June 27, 2022.

59. In purchasing her ticket, Ms. Beaulieu affirmatively clicked the box stating that she read, understood, and agreed to Version 2.9.16 of the Terms and Conditions on June 9, 2022.

60. Ms. Beaulieu used her ticket to board and travel upon Train 4 starting in Kansas City; an Amtrak conductor "lifted" or scanned Ms. Beaulieu's ticket on Train 4 at 12:26pm on June 27, 2022.

61. On May 18, 2022, Gregory Ahlquist utilized the Amtrak app to purchase tickets for himself, Dustin Boyd, and another passenger to travel on Amtrak Train 4 from Kansas City to Naperville, Illinois, departing June 27, 2022.

62. Upon information and belief, Mr. Boyd authorized Mr. Ahlquist to purchase a ticket on Mr. Boyd's behalf.

63. In purchasing the tickets for himself, Mr. Boyd, and another passenger, Mr. Ahlquist affirmatively clicked the box stating that he read, understood, and agreed to Version 2.9.15 of the Terms and Conditions on May 18, 2022.

64. Mr. Boyd used his ticket to board and travel upon Train 4 starting in Kansas City; an Amtrak conductor lifted Mr. Boyd's ticket on Train 4 at 12:14pm on June 27, 2022.

65. On June 1, 2022, Wendy Burkett utilized the Amtrak app to purchase a ticket for herself to travel on Amtrak Train 4 from Kansas City to Chicago, departing June 27, 2022.

66. In purchasing her ticket, Ms. Burkett affirmatively clicked the box stating that she read, understood, and agreed to Version 2.9.16 of the Terms and Conditions on June 1, 2022.

67. Ms. Burkett used her ticket to board and travel upon Train 4 starting in Kansas City; an Amtrak conductor lifted Ms. Burkett's ticket on Train 4 at 12:17pm on June 27, 2022.

68. On May 3, 2022, Joseph Disciacca utilized the Amtrak website to purchase tickets for Todd Covington and another passenger to travel on Train 4 from Kansas City to Chicago, departing June 27, 2022.

69. Upon information and belief, Mr. Covington authorized Mr. Disciacca to purchase a ticket on Mr. Covington's behalf.

70. In purchasing the tickets for Mr. Covington and another passenger, Mr. Disciacca affirmatively clicked the box stating that he read, understood, and agreed to Version 2.9.15 of the Terms and Conditions on May 3, 2022.

71. Mr. Covington used his ticket to board and travel upon Train 4 starting in Kansas City; an Amtrak conductor lifted Mr. Covington's ticket on Train 4 at 12:25pm on June 27, 2022.

72. On May 26, 2022, Joseph Disciacca utilized the Amtrak website to purchase a ticket for himself to travel on Train 4 from Kansas City to Chicago, departing June 27, 2022.

73. In purchasing his ticket, Mr. Disciacca affirmatively clicked the box stating that he read, understood, and agreed to Version 2.9.16 of the Terms and Conditions on May 26, 2022.

74. Mr. Disciacca used his ticket to board and travel upon Train 4 starting in Kansas City; an Amtrak conductor lifted Mr. Disciacca's ticket on Train 4 at 12:25pm on June 27, 2022.

75. On June 18, 2022, Nicolas Dehoyos utilized the Amtrak website to purchase a ticket for himself to travel on Train 4 from Los Angeles to Chicago, departing June 25, 2022.

76. In purchasing his ticket, Mr. Dehoyos affirmatively clicked the box stating that he read, understood, and agreed to Version 2.9.16 of the Terms and Conditions on June 18, 2022.

77. Mr. Dehoyos used his ticket to board and travel upon Train 4 starting in Los Angeles; an Amtrak conductor lifted Mr. Dehoyos' ticket on Train 4 at 7:06pm on June 25, 2022.

78. On June 22, 2022, Lyesia Crite utilized Amtrak's website to purchase tickets for Susan Juarez-Mora and Ms. Juarez-Mora's daughter, A.J.M., to travel on Train 4 from Albuquerque, New Mexico to Chicago, departing June 26, 2022.

79. Upon information and belief, Ms. Juarez-Mora authorized Ms. Crite to purchase a ticket on Ms. Juarez-Mora's behalf and on behalf of Ms. Juarez-Mora's daughter, A.J.M.

80. In purchasing the tickets on behalf of Ms. Juarez-Mora and A.J.M., Ms. Crite affirmatively clicked the box stating that she read, understood, and agreed to Version 2.9.16 of the Terms and Conditions on June 22, 2022.

81. Ms. Juarez-Mora and A.J.M. used their tickets to board and travel upon Train 4 starting in Albuquerque; an Amtrak conductor lifted both their respective tickets at 2:21pm on June 26, 2022.

82. In January 2022, Craig Thomas contacted the "Group Sales" department at Amtrak to book travel for a group of passengers—including Jonathan Awe, I.A., Elijah Awe, Julian Boardman, and Harrison Boardman—from Raton, New Mexico to Milwaukee, Wisconsin, with Train 4 taking the group from Raton to Chicago.

83. On January 14, 2022, Amtrak sent Craig Thomas a Group Travel Confirmation letter that stated, "Transportation on Amtrak is subject to the terms and conditions on your ticket and associated ticket jacket. Additional terms and travel information can be found on Amtrak.com."

84. As of January 14, 2022, Amtrak's Terms and Conditions contained an Arbitration Agreement identical to those found in Version 2.9.15 and Version 2.9.16.

85. On June 7, 2022, Amtrak mailed to Mr. Thomas individual tickets and ticket jackets for each member of the group.

86. The tickets and ticket jackets stated "This ticket is a contract of carriage between Amtrak and the ticket holder which is subject to specific terms and conditions. Those terms and conditions are available for inspection at Amtrak ticket counters or on the Amtrak Web site at www.amtrak.com, or may be requested by calling 1-800-USA-RAIL."

87. The group, including Jonathan Awe, I.A., Elijah Awe, Julian Boardman, and Harrison Boardman, used their respective tickets to board and travel upon Train 4 starting in Raton; an Amtrak conductor lifted each of their respective tickets at 9:24pm on June 26, 2022.

88. When the group members received and used their paper tickets in June 2022, Version 2.9.16 of the Terms and Conditions was in effect.

89. Jonathan Awe, I.A., Elijah Awe, Julian Boardman, and Harrison Boardman agreed to Version 2.9.16 of Amtrak's Terms and Conditions—including the binding Arbitration Agreement—by accepting and using their tickets subject to the Terms and Conditions.

90. In contravention of the terms and conditions acknowledged and agreed to by and on behalf of Defendants, Defendants filed state court actions against BNSF.

91. Defendants have refused to arbitrate their claims in accordance with the parties' Arbitration Agreement(s).

## COUNT I
### Petition to Compel Arbitration Pursuant to 9 U.S.C. § 4.

92. BNSF incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth here.

93. The parties' Arbitration Agreement involves interstate commerce and states that it is governed by the Federal Arbitration Act.

94. The parties' Arbitration Agreement is valid, irrevocable, and enforceable under the Federal Arbitration Act, 9 U.S.C. § 2.

95. BNSF is aggrieved by Defendants' refusal to arbitrate.

96. BNSF is entitled to an Order directing the parties to arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4.

97. Service of this Complaint serves as the notice to Defendants that BNSF is petitioning the Court for such an Order. No sooner than five days after service of this Complaint, BNSF prays for a hearing to determine the matter.

98. BNSF prays for an Order directing Defendants to arbitrate all their claims as set forth in their state court actions in accordance with the terms of the parties' Arbitration Agreement.

## COUNT II
### Petition to Stay State Court Actions Pursuant to 9 U.S.C. § 3

99. BNSF incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth here.

100. The claims Defendants bring in their state court actions are all referable to arbitration under the parties' Arbitration Agreement.

101. A stay of the state court actions is necessary to effectuate an Order from this Court compelling arbitration.

102. Pursuant to Section 3 of the Federal Arbitration Act, BNSF prays for an Order staying proceedings in the state court actions until the parties have arbitrated Defendants' claims.

## COUNT III
### Petition for Preliminary Injunction Pending Arbitration

103. BNSF incorporates the allegations set forth in Paragraphs 1-91 above as if fully set forth here.

104. An order prohibiting Defendants from litigating their claims in the state court actions is necessary to effectuate this Court's Order compelling the parties to arbitration.

105. Without an injunction, BNSF will be irreparably harmed. Despite the parties' valid and enforceable Arbitration Agreement, BNSF will be subjected to the burdens and costs of civil litigation which are not applicable to arbitration proceedings and for which BNSF will have no remedy.

106. There is a substantial likelihood that BNSF will prevail on the merits of this action, because the parties' Arbitration Agreement is valid and enforceable pursuant to the Federal Arbitration Act.

107. There is little likelihood of harm to Defendants should a preliminary injunction issue. Defendants will be able to pursue any available remedies for their claims through arbitration, pursuant to the terms of the Arbitration Agreement.

108. The public interest would be served in granting a preliminary injunction because it will promote the rapid and unobstructed enforcement of an agreement willingly entered into between parties, would prevent unnecessary waste of judicial resources, and would allow Defendants to promptly pursue their claims in arbitration.

109. BNSF prays for a preliminary injunction prohibiting Defendants from pursuing the state court actions while the parties arbitrate their claims.

WHEREFORE, BNSF prays the Court grant the following relief: For a hearing on this matter; for an Order compelling the arbitration of all of Defendants' claims arising out of or relating to their respective state court actions; for an Order staying the state court actions until the parties have completed arbitration; for an injunction prohibiting Defendants from pursuing the

state court actions while the parties arbitrate; and for such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ *Sean P. Hamer*
Sean P. Hamer         MO # 48153
Scott R. Ast          MO # 51699
Paula Brown           MO # 45870
Alex A. McKenna       MO # 72024
SCHARNHORST AST KENNARD GRIFFIN, P.C.
1100 Walnut, Suite 1950
Kansas City, Missouri 64106
T: (816) 268-9400/F: (816) 268-9409
Email: shamer@sakg.com
       sast@sakg.com
       pbrown@sakg.com
       amckenna@sakg.com

Mark S. Landman  (*Pro Hac Vice Pending*)
LANDMAN CORSI BALLAINE & FORD, P.C.
120 Broadway, 13th Floor
New York, New York 10271
T: (212) 238-4800/F: (212) 238-4848
Email: mlandman@lcbf.com

John A. Bonventre (*Pro Hac Vice*)
LANDMAN CORSI BALLAINE & FORD, P.C.
One Gateway Center, 22nd Floor
Newark, NJ 07102
T: (973) 623-2700/F: (973) 623-4496
Email:  jbonventre@lcbf.com

*Attorneys for BNSF Railway Company*